1   **LAW OFFICES OF ROSEN & ZIMMERMAN**
    HOWARD S. ROSEN; State Bar #154191
2   (hsr@rosenzimmerman.com)
    PAUL S. ZIMMERMAN; State Bar #188835
3   (psz@rosenzimmerman.com)
    30423 Canwood Street, Suite #201
4   Agoura Hills, CA  91301
    (818)597-1711/(818)597-8597(FAX)
5
    **BLEAU FOX A.P.L.C.**
6   THOMAS P. BLEAU; State Bar #152945
    (bleaushark@aol.com)
7   3575 Cahuenga Blvd. West, Suite #580
    Los Angeles, CA 90068
8   (323)874-8613/(323)874-1234(FAX)

9   Attorneys for Plaintiffs Edward Konik and William Malin

10

11
                     **UNITED STATES DISTRICT COURT**
12
              **FOR THE CENTRAL DISTRICT OF CALIFORNIA**
13

14  EDWARD KONIK AND                ) CASE NO: **CV07-0763- SVW (RZx)**
    WILLIAM MALIN, individually,    )
15  and on behalf of others similarly )
    situated,                       ) **PLAINTIFFS' MEMORANDUM OF**
16                                  ) **POINTS AND AUTHORITIES IN**
                 Plaintiffs,        ) **OPPOSITION TO DEFENDANT**
17                                  ) **TIME WARNER CABLE'S MOTION**
    vs.                             ) **FOR SUMMARY JUDGMENT RE**
18                                  ) **STANDING**
    TIME WARNER CABLE,              )
19  and DOES 1 through 100, inclusive, ) Date:    February 8, 2010
                                    ) Time:    1:30 p.m.
20               Defendants.        ) Crtrm:   6
                                    )
21  _____ )

22

23

24

25

26

27

28

*Rosen & Zimmerman*
30423 Canwood Street, Suite 201
Agoura Hills, CA 91301

1

**TABLE OF CONTENTS**

I   INTRODUCTION.................................................................................4

II  THE STANDING REQUIREMENTS IMPOSED AFTER
    PROPOSITION 64 HAVE NOT CHANGED THE LARGER
    INTENT OF THE CONSUMER PROTECTION STATUTES
    PROTECT THE GENERAL PUBLIC AND DETER FUTURE
    MISCONDUCT BY DEFENDANTS.....................................................5

    A. The UCL Anti-fraud Provisions Serve a Larger Public
       Policy Purpose than Common Law Fraud and Focus on
       the Defendant's Conduct Rather than the Plaintiff's Damages.......7

    B. The UCL and FAL Impose a More Expansive Calculation of
       Damages than the CLRA, Reflecting an Intent to Deter Future
       Violations...................................................................................10

III TWC HAS FAILED TO ESTABLISH THE ABSENCE OF
    TRIABLE ISSUES OF MATERIAL FACT REGARDING
    PLAINTIFFS' STANDING.................................................................11

    A. Plaintiffs' Reliance on TWC's Misrepresentations Can Only
       Be Negated by a Showing That They Knew, Suspected or
       Believed That Those Representations Were False...........................13

    B. Plaintiffs Did Not Learn about TWC's Price, Channel Line-up and
       Equipment Changes until They Experienced the Effects of TWC's
       False Promises..............................................................................14

       1. Plaintiff Konik .......................................................................15

       2. Plaintiff Malin ........................................................................17

C.  The Subscriber Agreement Did Not Affect Plaintiffs Reliance
    on TWC's Advertisements and by Law Cannot Limit TWC's Liability............19

       1. Plaintiffs didn't know that they would have service
          interruptions until their service was interrupted......................20

       2. The Subscriber Agreement Does Not Limit Plaintiffs'
          Statutory Protection Against False Advertising.......................21

       3. The Transition from Adelphia to TWC Includes Digital
          Converter Boxes ....................................................................21

       4. TWC Is Liable for All Interruptions in Service...........................22

IV  CONCLUSION...................................................................................23

*Rosen & Zimmerman*
30423 Canwood Street, Suite 201
Agoura Hills, CA 91301

1

# TABLE OF AUTHORITIES

2

3

## Cases

4   *Buckland v. Threshold Enters. Ltd.*
      155 Call.App4th 768 (2008)...................................................................6, 13

5

6   *California Assoc. of Dispensing Opticians v. Pearle Vision Center*
      143 Cal.App.3d 419 (1983)........................................................................8

7   *Caro v. Procter & Gamble Co.*
      18 Cal.App.4th  644 (1993)...................................................................6, 13

8

9   *Colgan v. Leatherman Tool Group, Inc.*
      135 Cal. App. 4th 663, 696 (2006)..........................................................10

10  *Fletcher v. Sec. Pac. Nat'l Bank*,
      23 Cal. 3d 442 (1979)..............................................................................10

11

12  *In Re Tobacco II Cases*
      46 Cal.4th 298 (2009)......................................................................7, 9, 22

13  *Laster v. T-Mobile USA, Inc.*,
      407 F. Supp. 2d 1181, 1194 (S.D. Cal. 2005).........................................8

14

15  *Laster v. T-Mobile USA*, Inc.
      2009 U.S. Dist. LEXIS 116228 (S.D. Cal. Dec 14, 2005)
      [cited by Defendant as 2009 WL 4842801 (S.D. Cal. Dec 14, 2005)]............8, 13

16

17  *Pollard v. Ericsson, Inc.*
      125 Cal.App.4th 214 (2004).....................................................................8

18

19

## Statutes

20

21  Cal. Business & Professions Code §17200....................................................5

22  Cal. Business & Professions Code § 17500...................................................5

23  Cal. Civil Code § 1770 .................................................................................7

24  Cal. Civil Code § 175l..................................................................................19

25

26

27

28

Rosen & Zimmerman
30423 Canwood Street, Suite 201
Agoura Hills, CA 91301

**I**

**INTRODUCTION**

As the Court held in its Order of December 2, 2009, there is a triable issue concerning Plaintiff's reliance on Time Warner Cable ("TWC")'s advertised promises that if they stayed with TWC after its acquisition of the Adelphia cable television franchise Plaintiff would have the same programming at equal or less cost, without service interruptions and without the need for new equipment.

TWC now claims that Plaintiffs have no standing in that they cannot show actual harm prior to the time that they learned TWC's promises were false. In fact, even under the standard that limits their damages to harm suffered prior to learning that the promises were false, Plaintiffs suffered injury in fact.

Contrary to TWC's assertions, Plaintiffs did not learn of the falsity of TWC's promises from the mailing that TWC purportedly sent out in September, 2006. Both Plaintiffs learned that they would need higher-priced digital service and new equipment to receive channels which they had previously received with analog service only when they watched their televisions, were unable to receive an analog feed of those channels, and thereafter discovered from TWC that new equipment and different service packages would be required if they wanted to continue to receive those channels.

Plaintiffs paid for channels that they could not receive before they discovered that they were not getting those channels. This went on for approximately a month in the case of Mr. Konik and for over six weeks in the case of Mr. Malin. Similarly, Plaintiffs only learned of service interruptions when those interruptions occurred, not from TWC's mailed Subscriber Agreement, which neither of them recalls getting or ever having read.

In addition, Plaintiffs believe that their injuries should not be limited to the period between when the channels were switched to digital and the time they learned that those channels had been switched.

Rosen & Zimmerman
30423 Canwood Street, Suite 201
Agoura Hills, CA 91301

4

Under California's Unfair Competition Law ("UCL," Cal Bus. and Professions Code §§ 17200 et seq.) and False Advertising Law ("FAL," Cal Bus. and Professions Code §§ 17500 et seq.) fraud is assessed differently than it is under a common law fraud claim.  The focus is on the defendant's conduct, rather than the plaintiff's damages, in order to effectuate a policy of protecting the general public against unscrupulous business practices and restitution serves the purpose not merely of making the plaintiff whole or forcing the offender to disgorge ill-gotten gains, but of deterring the offender from future violations.

This is surely a case that calls out for the expansive penalties of the consumer protection statutes.  TWC not only made false promises, but kept the ads making those promises on its internet website long after they knew that their customers would not continue to receive the same programming for the same cost. [GI 51, and see Order, p. 5, fn. 3.]

Plaintiffs therefore request that TWC's motion be denied and the measure of damages not be restricted by the precedent of common law fraud jurisprudence.

## II

## THE STANDING REQUIREMENTS IMPOSED AFTER PROPOSITION 64 HAVRE NOT CHANGES THE LARGER INTENT OF THE CONSUMER PROTECTION STATUTES TO PROTECT THE GENERAL PUBLIC AND DETER FUTURE MISCONDUCT BY DEFENDANTS

The matter of damages, as the Court noted, was not raised by TWC in its motion for summary judgment.  (Order, 52:1-3)  Necessarily therefore, the issue of reliance in conjunction with injury in fact was not briefed.  The court suggested that reliance in the context of a plaintiff's "ongoing or continuous decision to act or refrain from acting, which is based at least in part on defendant's alleged representations" and case law interpreting  any differing conceptions of harm between the UCL, FAL and CRLA be addressed.  (Order, 53:5-8.)

Rosen & Zimmerman
30423 Canwood Street, Suite 201
Agoura Hills, CA 91301

Rosen & Zimmerman
30423 Canwood Street, Suite 201
Agoura Hills, CA 91301

1   Relying on precedent established in common law fraud cases, this Court took the

2   position that

3          TWC cannot be held liable for any damages resulting

4          from Plaintiffs' decision to remain TWC subscribers

5          after the time they learned the truth about the price

6          changes, channel line-up and service interruptions.

7   (Order, 51:19-21.)  However, as the Court noted, in all those cases where the

8   plaintiffs' knowledge of the falsity of defendants' representations defeated their

9   claims of reliance on those representations, that knowledge had been gained *before*

10  the plaintiffs entered into the allegedly fraudulent transactions. (*Buckland v.*

11  *Threshold Enters., Ltd.* 155 Cal.App.4th 768, 808-809 (2008); *Caro v. Procter &*

12  *Gamble Co.*, 18 Cal.App.4th 644, 668-669 (1993).)

13  The instant action is distinguishable from the cases cited in the Court's Order in

14  that Plaintiff herein did not learn of the false representations until *after* they had

15  agreed to become TWC customers.  The Court has adopted what might be termed an

16  ongoing reliance obligation, whereby Plaintiffs are required either to terminate their

17  subscription or abandon any claim for damages at any time after they entered into a

18  transaction with TWC if they learn that TWC's representations were false, because

19  reliance is no longer justified once they learned that they were deceived.  Under this

20  approach, the discovery of the deception effectively redounds to the benefit of the

21  deceiver, forcing the Plaintiffs either to terminate service entirely or acquiesce by

22  accepting less than the advertisements promised without hope of compensation.

23  TWC has little or no incentive to make honest representations: if deception goes

24  undiscovered, there is no complaint; if it is discovered, liability ends at the point of

25  discovery.  As TWC essentially argues in its motion, it is free to advertise falsely to

26  attract customers so long as it gives sufficient "notice" some time prior to reneging

27  on the advertised promises that initially attracted those customers.

28  / /

**A. The UCL Anti-fraud Provisions Serve a Larger Public Policy Purpose than Common Law Fraud and Focus on the Defendant's Conduct Rather than the Plaintiff's Damages**

Notwithstanding whatever suitability the approach outlined in the previous section might have in relation to common law fraud claims, it does not appear consistent with the history and intent of the UCL, which is designed to enforce public policies favoring fair business practices and consumer protection:

> The fraudulent business practice prong of the UCL has been understood to be distinct from common law fraud....
>
> [T]he UCL's focus [is] on the defendant's conduct, rather than the plaintiff's damages, in service of the statute's larger purpose of protecting the general public against unscrupulous business practices.

(*In Re Tobacco II Cases*, 46 Cal.4th 298, 312 (2009), internal quotes and citation omitted.)  Moreover, the procedural requirements imposed by Proposition 64

> left entirely unchanged the substantive rules governing business and competitive conduct. Nothing a business might lawfully do before Proposition 64 is unlawful now, and nothing earlier forbidden is now permitted.

(*Id*., at p. 314.)

In short, the reliance and injury in fact requirements imposed by Proposition 64 must be construed in a manner that is consistent with the UCL's "larger purpose" to discourage "unscrupulous business practices."

Historically, the types of advertising actionable under the UCL and the FAL include ads that set up "bait-and-switch" schemes in which the customer is lured in with an ad offering a good deal or specific services and then induced to accept something different.  This practice is also prohibited under express provisions the CRLA: Civil Code § 1770, subd. (a)(9) prohibits "advertising goods and services

Rosen & Zimmerman
30423 Canwood Street, Suite 201
Agoura Hills, CA 91301

7

Rosen & Zimmerman
30423 Canwood Street, Suite 201
Agoura Hills, CA 91301

1    with intent not to sell them as advertised," while subd. (a)(17) prohibits bait-and-

2    switch rebate offers. (*See Pollard v. Ericsson, Inc.* 125 Cal.App. 4th 214, 221

3    (2004).)

4        This issue was addressed in *California Assoc. of Dispensing Opticians v. Pearle*

5    *Vision Center*, 143 Cal.App.3d 419 (1983), in which the defendant advertised, but

6    did not actually offer, "full eye care." (*Id*., at p. 433.)  Specifically, defendant Pearle

7    was not licensed to perform eye exams and the phrase "full eye care" implied that

8    those services. (*Id*., at p. 424.)  Pearle argued that the "misleading nature of the ad

9    was cured when customers called for appointments, because they were then

10   informed that Pearle did not, in fact perform eye exams." (*Ibid*.)

11       Pearle, that is, adopted a position essentially identical to that which TWC has

12   taken in the instant action: subsequent information that shows its ads were

13   misleading excuses the falsity.  This argument is, however, clearly subversive of the

14   intent of the consumer protection intent of the UCL and the court rejected it, holding

15   that it "simply does not answer the charge that the advertisement itself is misleading.

16   Such a tactic is akin to the 'bait and switch' technique," and upholding liability

17   under the UCL and FLA, inter alia. (*California Assoc. of Dispensing Opticians*, 143

18   Cal.App.3d at p. 24.)[1]

19       Put another way, reliance in these cases is assessed as of the time the false

20   advertising induces the customer to initiate action that ultimately results in harm to

21   him, not at a later point when the customer enters into the substituted transaction

22   that establishes the falsity of the ad and was made possible by the false ad.  The

23

24       [1]The District Court that decided *Laster v. T-Mobile USA, Inc*., 2009 U.S. Dist.

25   LEXIS 116228 (S.D. Cal.), a case relied upon by TWC, concluded in an earlier ruling
     that the plaintiffs could proceed on a bait-and-switch theory. (*Laster v. T-Mobile USA*,

26   *Inc*., 407 F. Supp. 2d 1181, 1194 (S.D. Cal. 2005).)  That court's subsequent conclusion
     that a plaintiff's acceptance of the "switch" deal "rebuts the presumption of reliance"

27   is logically inconsistent with the right to proceed under a bait-and-switch theory. (2009

28   U.S. Dist. LEXIS 116228 at p. *21.)

1  deceptive advertiser is held liable for the harm that is consequential to his ad, that

2  harm being the difference in value between what was advertised and what was

3  ultimately delivered.

4      The bait-and-switch cases are relevant to the reliance/injury-in-fact issue

5  because in such cases the injured parties necessarily know that the advertised deals

6  or services are false when they accept the proffered alternative, but the false

7  advertising nevertheless remains actionable.  The consumer is not put in the position

8  of either walking away entirely or accepting the "switch" without hope of legal

9  recourse.  Rather, consistent with the legislative intent to protect him and deter

10 unscrupulous practices, the consumer is allowed to accept the proffered alternative

11 and to be compensated to the extent that the alternative is less favorable than what

12 was advertised.

13     The instant case is no different.  TWC induced Plaintiffs to accept it as their

14 cable service provider with the bait of advertised promises regarding price, channel

15 line-ups, equipment requirements and service quality; TWC subsequently switched

16 its channel line-ups and pricing, caused a need for new equipment, and provided

17 lesser quality service, all to the detriment of Plaintiffs.  In many respects the switch

18 was more insidious than that in the typical retail bait-and-switch because Plaintiffs

19 did not even have to affirmatively assent to it: TWC simply changed and diminished

20 the services while billing as though nothing had changed.  Under these

21 circumstances, it is unclear why, given the intent of and precedents established

22 under California's consumer protection legislation, Plaintiffs should be forced into

23 the Hobson's choice of no service or service with diminished value.  Traditionally,

24 TWC should be liable to Plaintiffs for restitution of the difference in value between

25 what was promised and what was delivered. Proposition 64 does not compel any

26 change in approach. (*In Re Tobacco II Cases*, *supra*, 46 Cal.4th at p. 314.)

27 //

28 //

Rosen & Zimmerman
30423 Canwood Street, Suite 201
Agoura Hills, CA 91301

**B. The UCL and FAL Impose a More Expansive Calculation of Damages than the CLRA, Reflecting an Intent to Deter Future Violations**

The amount of restitution available under the CLRA is straightforward: compensation for actual loss and is a legal remedy. (*Colgan v. Leatherman Tool Group, Inc.*, 135 Cal. App. 4th 663, 695-696 (2006).) The standard for assessing damages under the UCL and FAL is equitable and more expansive because, under these statutes, "the remedy of restitution serves two purposes – returning to the plaintiff monies in which he or she has an interest and deterring the offender from future violations." (*Ibid.*) Consequently, "the court has "broad authority' under unfair competition law to fashion a remedy to deter defendant from engaging in future unfair trade practices." (*Ibid.*, citing *Fletcher v. Sec. Pac. Nat'l Bank*, 23 Cal. 3d 442, 450 (1979).) When damages are sought under both standards in the same action, the measure of compensation under the CLRA does not limit the compensation available under the UCL and the FAL. (*Colgan*, at p. 696.)

Looked at under either standard, Plaintiffs continue to suffer damage and injury in fact as a result of TWC's advertisements because initially they paid the same for less and, after getting the "switched" services, paid more for the same, including the added monthly charge for a digital converter box. On the other side of the same coin, TWC continues to profit from its false advertising for as long as plaintiffs pay a increased fees to get the same service they had when TWC promised in its ads that the service and equipment and prices would remain the same.

Under the CRLA, then, reflecting the statutory intent of consumer protection, and even more so under the UCL and FAL, reflecting the added intent of deterrence, the measure of restitution should consider the difference between what it would have cost Plaintiffs if the advertising had been true, and the increased cost to them of getting the same service after TWC changed the line-ups, pricing and equipment requirements, including the $4.50 to $6.90 per month cost of the digital converter box and the increased monthly cost in moving from the analog basic to a digital tier

10

Rosen & Zimmerman
30423 Canwood Street, Suite 201
Agoura Hills, CA 91301

1   required to get the programs previously available on analog. [GI 52]

2       The standard suggested by the Court seems even more problematic with regard

3   to interruptions in service because once the first interruption in service occurs, the

4   customer is necessarily aware that the promise that there would be no interruptions

5   in service is false.  At that point he is required either to end service entirely or accept

6   service with interruptions – and without statutory recourse under the UCL, FAL or

7   CLRA because he cannot rely on the advertising after the first interruption. And, any

8   claim for restitution based on a single, initial interruption is subject to the argument

9   that the interruption is de minimis and doesn't merit damages  – an argument that

10  TWC raises in the instant motion. (Defendant's P&A, p. 17, fn. 5.)   The legal

11  consequences for the false advertiser are so limited that there is no incentive to tell

12  the truth and therefore no deterrence.  This approach is not consistent with the intent

13  of the consumer protection legislation.

14

15                                         **III**

16  **TWC HAS FAILED TO ESTABLISH THE ABSENCE OF TRIABLE ISSUES**

17       **OF MATERIAL FACT REGARDING PLAINTIFFS' STANDING**

18       Even under the common-law based standard set out in the Court's Order, i.e.,

19  that Plaintiffs' reliance on TWC's statements and TWC's liability terminated once

20  Plaintiffs knew those statements to be untrue (unless there is a showing that

21  Plaintiffs were unable to end service), TWC has not met its burden to establish the

22  absence of a genuine issue of material fact.

23       The gist of TWC's argument is that Plaintiffs were put "on notice" that its

24  advertised statements were false (and thus couldn't have relied on those false

25  statements) by information purportedly mailed to Plaintiffs before the occurrence of

26  any events that confirmed the falsity of the advertised claims.  (Defendant's P&A,

27  11:21-12:2.)

28       Specifically, TWC argues first that Plaintiffs "knew" in advance, via letters and

Rosen & Zimmerman
30423 Canwood Street, Suite 201
Agoura Hills, CA 91301

1   accompanying pamphlets purportedly mailed in September, 2006, about the changes

2   in price, channel line-up and equipment needs that occurred (to Plaintiff's financial

3   detriment) in October and November, 2006.   (Defendant's P&A, 12:17-13:18.) The

4   second part of TWC's argument is that the TWC subscriber Agreement, allegedly

5   mailed to Plaintiffs in August, 2006, not only alerted Plaintiffs that TWC's

6   advertised promise of no interruptions in service was false but also limits TWC's

7   liability for interruptions that did occur.   (Defendant's P&A, 15:7-17:11.)

8       In essence, TWC argues that since it sent out representations in its mailings that

9   contradicted the representations made in its advertisements, Plaintiffs must have

10  known that the representations in the advertisements were false and those in the

11  mailings were true.   However, TWC fails to explain just how Plaintiffs could have

12  known which of two contradictory representations was true and which was false

13  simply by comparing the two.   It should be recalled in this context that the

14  advertisements upon which Plaintiffs relied continued to run on TWC's web site

15  during (and long after) the August and September mailings of the contradictory

16  information.  (Order, p. 5, fn. 3.)   TWC was simultaneously making contradictory

17  representations.   Obviously, the contradictory representations themselves furnished

18  Plaintiffs no logical or empirical basis from which to conclude that one

19  representation was false and the other true.   Only the occurrence of external events –

20  the actual changes in programming, price and equipment needs, and the interruption

21  of service – could have afforded Plaintiffs real knowledge with which to assess the

22  falsity of TWC's advertisements.

23      Moreover, TWC does not support its argument with any evidence that the

24  contradictory information was read or understood by Plaintiffs or that it influenced

25  their perception of the truth of TWC's advertisements.   TWC merely proceeds on the

26  unexplained assumption that the "notice" allegedly given to Plaintiffs by the

27  mailings automatically equates to Plaintiffs' "knowledge."

28  / /

Rosen & Zimmerman
30423 Canwood Street, Suite 201
Agoura Hills, CA 91301

Plaintiffs' Opposition to MSJ – Points and Authorities

**A. Plaintiffs' Reliance on TWC's Representations Can Only Be Negated by a Showing That They Knew, Suspected or Believed That Those Representations Were False**

The two cases cited in the Court's Order, *Buckland v. Threshold Enters.*, *supra*, and *Caro v. Procter & Gamble Co.*, *supra*, held that there could be no reliance where the plaintiff "suspected" that the defendant's representations were untrue (*Buckland*, 155 Cal.App.4th at p. 808-809) or "did not believe" the representations to be true (*Caro*, 18 Cal.App.4th at p. 668).   Similarly in *Laster v. T-Mobile USA, Inc.*, *supra*, 2009 U.S. Dist. LEXIS 116228 (S.D. Cal.), a case cited by TWC, the court speculates that there would be no reliance had the plaintiff acted "with knowledge" that defendant's representations were false. (*Id*., at p. *21.)  As the *Buckland* court explained, "actual reliance occurs only when the plaintiff reposes confidence in the *truth* of the relevant representation, and acts upon this confidence (*Id*., at p. 808, emphasis retained, relying on *Restatement (Second) of Torts*, §§546, 548.)

Under this standard, Plaintiffs' reliance on TWC's misrepresentations can only be negated by a showing that they "knew," "suspected" or "believed" that those misrepresentations were in fact false.  This is necessarily a subjective standard, dependant on evidence of the Plaintiffs' actual state of mind when they took action in response to TWC's representations.

TWC has adduced no evidence establishing when Plaintiffs actually "knew," "suspected" or "believed" that TWC's representations regarding price, channel line-up and equipment or service interruptions.  Even assuming, for the sake of argument, that TWC has furnished sufficient evidence to support its claims that Plaintiffs "received" the information allegedly mailed to them, TWC has failed to show that Plaintiffs' actual reliance – that is, their knowledge or belief about the truth of TWC's representations – was in any way affected by that information.

In failing to bring forth such evidence, TWC has failed to meet its threshold

Rosen & Zimmerman
30423 Canwood Street, Suite 201
Agoura Hills, CA 91301

13

1  burden of establishing the absence of a genuine issue of material fact.  Indeed, as

2  indicated below, the evidence clearly establishes that TWC's contradictory mailings

3  did not inform Plaintiffs that they could not rely upon TWC's advertised promises.

4

5  **B.  Plaintiffs Did Not Learn about TWC's Price, Channel Line-up and**

6  **Equipment Changes until They Experienced the Effects of TWC's False**

7  **Promises**

8      TWC asserts that Plaintiffs were "on notice" as a result of its mailings and

9  simply equates this notice with Plaintiff's having "learned the truth" about its

10  advertisements (Defendant's P&A, 11:24-28.)   TWC cites evidence – GI 5, 12, 16,

11  18 – that purportedly supports the "notice," but none to support the claim that

12  Plaintiffs "learned the truth."   TWC further asserts that "[at] the time Plaintiffs

13  received this letter and enclosed pamphlet. . . Plaintiffs knew the truth regarding any

14  changes to pricing and channel lineups."  (*Id.*, 13:10-12.)  Again, the evidence

15  adduced in support of this assertion – DUF 12-16, 45[2] – does not support the claim

16  that "Plaintiffs knew the truth."  TWC has simply failed to meet its initial burden of

17  showing that there is no triable issue of material fact concerning Plaintiffs' reliance.

18      This alone is sufficient cause to deny TWC's motion, but, in addition, there is

19  ample evidence, deliberately suppressed by TWC, that neither of the Plaintiffs

20  learned anything affecting their knowledge or beliefs about the representations upon

21  which they relied from the purported September mailings.

22      Plaintiff Konik, for example, testified that the "Important Price and

23  Programming Changes" pamphlet did not inform him that the Turner Classic Movies

24  channel had been dropped from his programming; rather, only when the matter was

25

26  ───────────────

27      [2]DUF 45 states that Plaintiffs had "full knowledge" of channel, equipment and
   price, but the evidence cited in support does not show that Plaintiffs possessed any such

28  knowledge.  *See* Plaintiff's Statement of genuine Issues, No. 45.

Rosen & Zimmerman
30423 Canwood Street, Suite 201
Agoura Hills, CA 91301

1   brought to his attention by his wife did he become aware that the channel line-up

2   had been changed. [GI 61]

3       In addition, Konik testified that he complained to a Sharon Parker of TWC that

4   he could not make sense of the line-up information sent to him by TWC: the list of

5   available "tiers" of programming was not consistent with the channel list:

6           There were selection of tiers you could have. Except

7           when you went to the channel lineup, it didn't say

8           anything about these tiers.  So you could not tell what

9           tiers were available, or what channels were available in

10          each tier.

11  [GI 62, 63]

12      The relevant question is whether Plaintiffs became aware of changes in the price

13  channel line-ups and equipment requirements before they paid for the reduced

14  services brought about by those changes.

15

16      1. <u>Plaintiff Konik</u>

17      The channel line-up in Mr. Konik's service sector changed on November 14,

18  2006. [GI 16]  There is no evidence that he had any personal knowledge prior to that

19  date of any changes that would affect his reliance on TWC's representations.

20      TWC asserts that it mailed a letter and a pamphlet entitled "Important Price and

21  Programming Changes" to Mr. Konik on September 24, 2006.  TWC's only

22  evidence of this mailing is the hearsay statements of Deborah Picciolo and business

23  documents that show only that mailings were requested. [GI 11, 16]  The court

24  rejected similar incompetent evidence submitted in support of TWC's first MSJ

25  regarding the alleged mailing of TWC's Subscriber Agreement.  (Order, p. 16, fn.

26  6.)

27      Mr. Konik himself could not recall receiving any letters regarding line-up

28  information, but did receive a

Rosen & Zimmerman
30423 Canwood Street, Suite 201
Agoura Hills, CA 91301

1  |  glossy multi-page pamphlet with the tier discussion in it

2  |  and the second thing was the channel lineup sheet, which

3  |  . . . did not agree in terminology with the tier lineup. So

4  |  you could not tell what channels were in what tiers from

5  |  the channel lineup sheet.

6  [GI 62]

7  On November 11, 2006, Mr. Konik called TWC to complain about the

8  incomprehensible line-up information and was told that he had probably been sent

9  the wrong information and to check on line. [GI 63] The online information was

10  identical to the incomprehensible pamphlet he had received. [GI 64]  Approximately

11  two months later, Mr. Konik received the same lineup information in a second

12  mailing. [GI 65]  Thus, the "information" that allegedly clued Mr. Konik in as to the

13  falsity of TWC's advertising was incomprehensible to him.

14  On December 12, 2006, Mr. Konik received a phone call from Ms. Parker, as

15  noted above, at which time he complained that Turner Classic movies had been

16  dropped from his service and that the tier and channel information supplied by TWC

17  was incomprehensible. Ms. Parker explained the new pricing system and asked him

18  if he wanted to change over to "the new lineup;" he said he would wait until March.

19  At this point, Mr. Konik became aware that he would have to pay more to continue

20  to receive programming he had been receiving. [GI 66]

21  Mr. Konik's testimony evidences that he was not aware that TWC's advertised

22  representations concerning price, line-up and equipment had been untrue until

23  December 12, 2006 at the earliest.  By this date, he had undoubtedly suffered injury

24  in fact and lost money as required by Cal. Bus. & Prof. Code § 17204 and the

25  damage required by Cal Civil Code § 1780(a) because, for approximately a month,

26  he was, unbeknownst to him, getting fewer channels for the same monthly payment

27  he had made before the channel line-up was changed.

28  The chronology is as follows:

Rosen & Zimmerman
30423 Canwood Street, Suite 201
Agoura Hills, CA 91301

Plaintiffs' Opposition to MSJ – Points and Authorities

1  Mr. Konik's bill for service from 10/25/06 to 11/24/06 was due on November 7,

2  2006.  (TWC Exh. E, p. 51.)  Payment was received October 30, 2006. (*Id*., at p. 54.)

3  Mr. Konik's bill for 11/25/06 to 12/24/06 was due on December 8, 2006 (*Id*., at

4  p. 53.) It was received on December 4, 2006. (*Id*., at p. 56.)

5  The line-up change went into effect on November 14, 2006.  [GI 16]  TWC

6  concedes that Mr. Konik's bill was not reduced.  In fact, his December bill went up

7  5 cents. [GI 9]

8  For one month, from mid-November to mid-December, Mr. Konik was charged

9  by TWC for channels that he could not receive before he became aware on

10  December 12, 2006 that TWC's promises about price, programming and equipment

11  requirements were untrue.  This is injury in fact.

12

13  2. Plaintiff Malin

14  As with Mr. Konik, TWC furnishes no evidence to show that the information it

15  claims to have mailed in September, 2006 altered Mr. Malin's reliance on TWC's

16  advertised representations about price, programming and equipment requirements.

17  TWC asserts that the information was sent to Mr. Malin "on or about"

18  September 22, 2006. [GI 11, 12]  As noted above, no competent evidence supports

19  the mailing.  Yet, even if Mr. Malin had received the pamphlet, he could not recall

20  in what form, whether it came via mail, or when it came – and, in any event, did not

21  recall reviewing it. [GI 43]   There is thus no evidence that Mr. Malin learned

22  anything relevant to his reliance on TWC's advertisements from  TWC's claimed

23  September mailings.

24  Mr. Malin learned that he no longer received channels he had previously gotten

25  not from TWC's mailings, but when he attempted to watch it on a TV without a

26  digital converter box and was unable to receive it. [GI 57]

27  Prior to this time, he had been told over the phone by a TWC representative that

28  his prices would go down and that the channels would be rearranged

Rosen & Zimmerman
30423 Canwood Street, Suite 201
Agoura Hills, CA 91301

17

1  into some kind of subjects or groups that was going to

2  make more sense out of the lineup.  And it didn't turn out

3  that way because the channels that were available to me

4  without a digital box, channels that I really enjoyed,

5  were not, some of them were not.

6  So I got a box. So my rates didn't go down.

7  [GI 58, 59]

8  Like Mr. Konik, Mr. Malin only became aware that certain channels would be

9  dropped from the analog tier and that he would have to pay more and get a digital

10  converter box to receive those channels when his television set no longer received

11  those channels and inquiries to TWC revealed the truth of the matter.

12  Mr. Malin ordered the converter box on December 6, 2008 and it was installed

13  on the following day His December 8, 2006 bill reflects a charge for a partial

14  month's digital box rental from 12/07-12/17.  [GI 60.]

15  There is thus no evidence that Mr. Malin was aware that he would lose channels

16  he had already been getting, would have to order a digital converter box and would

17  have to pay more to get those channels back prior to his December 6, 2006

18  conversation with TWC when her ordered the box.

19  The line-up change in Mr. Malin's service area went into effect on October 24,

20  2006. [GI 12]   He knew by December 6, 2006 that TWC's advertising was false.

21  [GI 60]  Mr. Malin was therefore paying for services he did not receive for at least 6

22  weeks.

23  Mr. Malin's bill for service from 10/18/06 to 11/17/06 was due on October 30,

24  2006. [GI 1, (TWC Exh. F, p. 73.)]

25  Mr. Malin's Bill for Service from 11/18/06 to 12/17/06 was due November 30,

26  2006. (TWC Exh. F, p. 75.)

27  Payment for both bills was received on December 5, 2006.  (TWC Exh. F, p.78

28  The payment for channels that could not be received between the October 24,

18

Rosen & Zimmerman
30423 Canwood Street, Suite 201
Agoura Hills, CA 91301

1   2006 change to digital and December 6, 2006, when he finally became aware that

2   TWC's advertised promises were false, constitute Mr. Malin's injury in fact.

3

4   **C. The Subscriber Agreement Did Not Affect Plaintiffs Reliance on TWC's**

5       **Advertisements and by Law Cannot Limit TWC's Liability**

6       TWC advances four arguments in support of its motion on this issue.  The first is

7   basically a reprise of its argument concerning price and programming, i.e. that

8   Plaintiffs "knew" the ads promising "no interruption of service" were false because

9   a TWC mailing – the Subscriber Agreement this time – represented that there would

10  be interruptions.  (TWC P&A, 15:21-16:2.)   This argument contains the same flaws

11  as the price-and-programming argument because mailing is not established and there

12  is no evidence that either Plaintiff was aware of the content of the Subscriber

13  Agreement.  [GI 32]

14      TWC's second argument is that any restitution for service interruptions is

15  limited to that granted by the Subscriber Agreement or by TWC's "practice" of

16  granting rebates when requested.   This argument is an assertion that Plaintiffs have

17  waived their right to recovery and is prohibited by the antiwaiver provision of the

18  CRLA.  (Cal. Civil Code § 1751.)

19      TWC's final two arguments are addressed only to Plaintiff Konik's service

20  interruption.[3]

21   The first of the final two argues that the interruption to his service occasioned by a

22  faulty converter box is unrelated to the transition from Adelphia to TWC.  The last

23  argument, alluded to above, is that the interruption is too insignificant to merit

24  restitution.  These arguments are meritless as set out below.

25  //

26  //

27  _____

28          [3]TWC does not dispute that Mr. Malin's service was interrupted.

Rosen & Zimmerman
30423 Canwood Street, Suite 201
Agoura Hills, CA 91301

1    1. <u>Plaintiffs didn't know that they would have service interruptions until their</u>

2    <u>service was interrupted</u>

3    TWC, as it did in its first motion for summary judgment, asserts that Plaintiffs

4    were mailed a Subscriber Agreement in August, 2006.  Once again, the claim is

5    based on the declaration of Deborah Picciolo, who testified that the mailing was

6    made by an outside "provider," CSG, located in Nebraska and that she only has

7    second-hand knowledge that the Subscriber Agreement was ever mailed, on the

8    basis of CSG's claims to have inserted the subscriber agreement in mail sent to

9    Plaintiffs [GI 32]  Once again, the TWC "internal business documents" cited as

10   evidence that the Subscriber Agreement was mailed only establish that CSG was

11   authorized to mail the document; not that it did. [GI 32]  This time TWC seeks to

12   remedy Ms. Picciolo's lack of personal knowledge by having her describe the LOAs

13   in a little more detail (which still does not convert them from requests for mailing

14   into proof that mailing occurred) and assert that nothing from CSG shows the

15   mailings did not occur. [GI 32]  Ms. Picciolo's assertion that she is aware of nothing

16   that proves something didn't happen is hardly amounts to the personal knowledge

17   required to show that she is "competent to testify to the matters stated," as required

18   by F.R.C.P. Rule 56(e).

19   In addition, Mr. Malin testified that he couldn't recall receiving the Subscriber

20   Agreement Malin Depo at 57:23-58:2, 203:19-204:20) and Mr. Konik testified that

21   he never received it. Exh. 2 (Konik Depo., 199:13-22, 201:6-16.)

22   As with the information which TWC claims gave Plaintiffs knowledge of

23   impending changes in channel line-up, pricing and equipment, TWC has adduced no

24   evidence to show that any information contained in the Subscriber Agreement in any

25   way affected Plaintiffs' perceptions about the truth of TWC's advertised promises

26   that service would not be interrupted.

27   / /

28   / /

Plaintiffs' Opposition to MSJ – Points and Authorities

Rosen & Zimmerman
30423 Canwood Street, Suite 201
Agoura Hills, CA 91301

2. <u>The Subscriber Agreement Does Not Limit Plaintiffs' Statutory Protection Against False Advertising</u>

Beyond the issue of "knowledge" TWC also argues that provisions of the Subscriber Agreement, as well as TWC's "practice," limit Plaintiffs' right to recovery.   Thus, pursuant to the Subscriber Agreement, TWC says, Plaintiffs are only entitled to compensation if they suffer loss of all cable channels and internet service for more than 24 hours.  TWC claims that Plaintiffs "bargained" for this and are stuck with it.  (TWC P&A, 16:8-16.)  TWC thus argues that Plaintiffs rights to restitution pursuant to statute are waived in favor of the compensation scheme included in TWC's adherence contract.

However, California Civil Code § 1751 provides that "[a]ny waiver by a consumer of the provisions of this title is contrary to public policy and shall be unenforceable and void."  TWC cannot limit the restitution available to Plaintiffs under the CRLA by contract.

A fortiori, if Plaintiffs' statutory remedies cannot be circumscribed by TWC's Subscriber Agreement, they can't be circumscribed by an informal TWC practice of which there is no evidence that Plaintiffs were even aware.

3. <u>The Transition from Adelphia to TWC Includes Digital Converter Boxes</u>

TWC also argues that the interruption was unrelated to the transition from Adelphia to TWC because the interruption was caused by a malfunction of the digital computer box.  This argument is based entirely on the conclusory assertion of Jose Leon, a TWC vice-president, that, because the malfunction of the box caused the interruption, it was "not the result of the switchover of subscribers from Adelphia to TWC."

Without expressly saying so, TWC is apparently now taking the position that the transition or "switchover" from Adelphia to TWC only involved the "cable signal" and somehow excluded the digital converter boxes through which the signal passes

21

Rosen & Zimmerman
30423 Canwood Street, Suite 201
Agoura Hills, CA 91301

1   before it can be seen on the subscriber's television.  The billing records indicate that

2   TWC considers collection of the monthly rental fees for the digital boxes to be part

3   of transition, so unless TWC is transmitting these fees to Adelphia, it is only TWC's

4   responsibility for the functioning of the boxes that was miraculously left out of the

5   deal.

6   　　Moreover, Ms. Picciolo, TWC's President and PMK, testified that "transition"

7   involved "back office" issues, including "billing system integrations and those types

8   of things," i.e., the transition was not limited to the cable signal until TWC needed

9   an argument to escape responsibility for its false promise that there would be no

10  service interruptions, a promise which was not limited to interruptions caused by the

11  cable signal. [GI 8]

12

13  　　4. TWC Is Liable for All Interruptions in Service

14  　　Finally, TWC claims that Mr. Konik's interruption was not a "distinct and

15  palpable cognizable injury" because it only lasted five minutes.  This argument is

16  meritless first because TWC's advertisements didn't say "only short interruptions"

17  or "only interruptions of five minutes or less;" they promised " your service will *not*

18  be interrupted."  (Order, 30:12-14, 34:1-3.)  An interruption, however short, makes

19  the representation false.

20  　　Secondly, while five minutes may well be "equivalent to .000112 of the total

21  time" in a  31 day billing period as TWC argues, it amounts to 25% of the typical 20

22  minutes of non-commercial viewing time in a 30 minute television program, a

23  "distinct and palpable" hunk of time when your viewing has been interrupted.

24  　　Finally, as the Supreme Court reiterated in *In Re Tobacco II Cases*, *supra*, 46

25  Cal.4th 298, one of the purposes of class actions is to "make it economically feasible

26  to sue when individual claims are too small to justify the expense of litigation,"

27  which serves an "important role in the enforcement of consumers' rights." (*Id.*, at p.

28  313.)

Rosen & Zimmerman
30423 Canwood Street, Suite 201
Agoura Hills, CA 91301

22

1

2

## IV

## CONCLUSION

3      For all of the above-stated reasons, Plaintiffs' respectfully request that defendant

4  TWC's motion for summary judgment be denied.

5  Dated: January 25, 2010

6

7

8                                              /s/  Paul S. Zimmerman
                                               Paul S. Zimmerman
9                                              Attorney for Plaintiffs

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Rosen & Zimmerman
30423 Canwood Street, Suite 201
Agoura Hills, CA 91301

Plaintiffs' Opposition to MSJ – Points and Authorities